IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Kenneth Jordan, )<br>  )<br>  Plaintiff, )<br>  )<br>vs. )<br>  )<br>Jo Anne B. Barnhart, )<br>Commissioner of Social Security, )<br>  )<br>  Defendant. )<br>_____) | Civil Action No. 6:04-1938-TLW-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On January 4, 2002, the plaintiff filed an application for DIB alleging disability beginning May 13, 1994. The application was denied initially and on reconsideration. On August 20, 2002, the plaintiff requested a hearing, which was held on June 17, 2003. Following the hearing, at which the plaintiff, his attorney, and a vocational expert appeared,

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

the administrative law judge considered the case *de novo*, and on July 31, 2003, determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on April 29, 2004.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 1, 2001.
>
> (2)   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)   The claimant's degenerative joint disease of the lumbar spine is a severe impairment, based upon the requirements in the Regulations (20 CFR § 404.1521).
>
> (4)   This medically determinable impairment does not meet or medically equal one of the listed impairments In Appendix 1, Subpart P, Regulation No. 4.
>
> (5)   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).
>
> (7)   The claimant has the following residual functional capacity: lifting and carrying 20 pounds occasionally and 10 pounds frequently; no repetitive stooping, twisting, crouching, kneeling; and climbing of stairs or ramps; and no crawling balancing, or climbing of ladders or scaffolds.
>
> (8)   The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).
>
> (9)   The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

(10)  The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

(11)  The claimant has transferable skills from skilled work previously performed as described in the Body of the decision (20 CFR § 404.1568).

(12)  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

(13)  Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.22 as a framework for decision-making, there are a siginflcant number ot robs in the national economy that he could perform. Examples of such jobs include semi-skilled light jobs as a construction inspector, with 160 such jobs in the state economy and 9,300 nationally; records checker, with 180 such jobs in the state economy and 14,000 nationally; and produce coordinator, with 700 such jobs in the state economy and 49,100 nationally. In addition, the claimant can perform semi-skilled sedentary jobs, such as payroll, with 1.800 such jobs in the state economy and 133,000 nationally; produce coordinator with 900 such jobs in the state economy and 58,000 nationally; and stock checker, with 1,000 such jobs in the state economy and 50,000 nationally.

(14)  The claimant was not under a "disability," as defined in the Social Security Act. at any time through the date last insured (20 CFR § 404.1520(f)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

3

>has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a *prima facie* showing of disability by showing that he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **FACTS PRESENTED**

The plaintiff, 52 years old at the time of the ALJ's decision (Tr. 206), alleges disability based on degenerative disc disease, migraine headaches, high blood pressure and carpal tunnel syndrome (Tr. 42). He has a high school education and prior work experience as a painter and a painting supervisor and inspector (Tr. 206). The plaintiff was

employed at the Savannah River Site for 20 years and alleges he became disabled on May 13, 1994 (Tr. 42). The date he was last insured (DLI) was September 1, 2001.

The plaintiff has had back problems since at least 1982.[2] In 1994, the Dr. John Downey began treating the plaintiff. In September 1994, Dr. Downey noted that a recent MRI revealed degenerative joint disease, disc bulging and some impingement on the ventral aspect of the thecal sac, but no significant compromise of neural roots. The plaintiff's muscle strength and reflexes were normal. Dr. Downey opined that the plaintiff had reached maximum medical improvement and assessed his impairment rating to be in the 10-15% range based upon his symptoms and objective findings. Dr. Downey noted that the plaintiff's employability at SRS would be limited by the permanent work restrictions and he recommended that the plaintiff seek vocational rehabilitation (Tr. 161-162).

The plaintiff also received treatment for his headaches from Dr. R. A. Eisenberg. In 1994, the plaintiff was taking medication for the headaches, with varied results (Tr. 160). On January, 27, 1995, Dr. Eisenberg noted that the plaintiff's headaches occurred approximately twice a week and that they were under adequate control on medication (Tr. 159).

Dr. Downey's notes indicate that on January 18, 1995, the plaintiff reported that his employer would not allow him to return to work with permanent restrictions. Dr. Downey reviewed a functional capacity evaluation from May 1994 which recommended light duty restrictions. Dr. Downey again gave the plaintiff a 15% permanent impairment rating and encouraged the plaintiff's employer to keep him gainfully employed if at all possible (Tr. 159).

On March 15, 1995, Dr. Downey again notes that the plaintiff "is not completely and totally disabled. He does have physical capabilities and is capable of

---

[2]The record shows that the plaintiff underwent cervical fusion surgery at C5-6 in 1982 (Tr. 169; 174; 176).

returning to limited or light duty work" (Tr. 158).  On August 7, 1996, Dr. Downey diagnosed chronic lower back pain, probable bilateral S1 radiculopathy, mild and neuropathic symptoms.  He recommended Neurontin and Vicodin for breakthrough pain (Tr. 155).

The plaintiff continued to see Dr. Eisenberg for treatment of his headaches. On November 16, 1996, Dr. Eisenberg noted that the plaintiff's headaches had stabilized and he recommended a decreased dosage of Elavil (Tr. 154).  By February 1997, the plaintiff reported to Dr. Eisenberg that his headaches were stable, still occurring about twice a week, and that they were responding well to Fioricet.  Dr. Eisenberg recommended that the plaintiff keep taking Elavil and Fioricet for breakthrough headaches (Tr. 153).  In June 1997, the plaintiff reported that the headaches had increased in frequency.  Dr. Eisenberg continued the plaintiff on Elavil and Fioricet for breakthrough pain and referred the plaintiff to a chronic pain treatment center (Tr. 153).

On September 2, 1998, Dr. Downey again examined the plaintiff, who was complaining of lower back and left leg pain and numbness in his left leg.  Dr. Downey's examination revealed obvious weakness of the left S1 distribution, decreased left Achilles reflex, and a negative seated straight leg raise. Back x-rays revealed L5-S1 degenerative disc disease with disc space narrowing and foraminal encroachment, generous lumbar lordosis, but no evidence of spondylolisthesis or spondylosis.  Dr. Downey diagnosed lumbar radiculopathy and lumbar degenerative joint and disc disease.  He recommended that the plaintiff take Vicodin and Daypro (Tr. 153).  Three weeks later, the plaintiff reported that Daypro gave him minimal to moderate relief, but that he continued to have pain in the afternoon or evening.   Dr. Downely diagnosed lumbar radiculopathy and lumbar degenerative joint disease.  He administered a trigger point injection and recommended physical therapy (Tr. 152).

On November 29, 2000, Dr. Thomas Jackson examined the plaintiff for intermittent shoulder and head pain, associated with headaches, mostly on the left side,

and lumbar pain with some radiation down into his left hip and thigh with no numbness or weakness. The plaintiff walked with a limp and displayed some difficulty in moving. Dr. Jackson's examination revealed tenderness in the plaintiff's neck, lumbar spine, left hip and thigh area. Dr. Jackson diagnosed lumbar and trapezius strain (Tr. 120).

On January 8, 2001, Dr. Jackson noted that the plaintiff had some mild improvement but still had a fair amount of back pain. His blood pressure was "doing well" and he walked stiffly and wore a back brace. Dr. Jackson referred the plaintiff to Dr. Epstein for followup (Tr. 119).

On January 23, 2001, Dr. Epstein examined the plaintiff, who complained of left cervical pain, headaches, intermittent paresthesia in the hands and left lumbar pain radiating into the left lower extremity following a November 2000 motor vehicle accident. Examination revealed normal hand strength and muscle strength and some tenderness of the cervical facets, together with some paraspinal muscle spasms. Cervical spine x-rays revealed a solid fusion at C5-6 with anterior spurring at C4-5 and loss of disc height at C6-7. Lumbar spine x-rays revealed degenerative disc disease at L5-S1 with degenerative changes of the lumbar spine. Dr. Epstein diagnosed left cervical radiculopathy; element of carpal tunnel syndrome bilaterally; aggravation of pre-existing lumbar mechanical pain with chronic S1 radiculopathy on the left; and aggravation of pre-existing cervical and lumbar degenerative disc disease and arthritis. He recommended that the plaintiff continue taking Piroxicam and Darvocet, together with a trial of Ultram (Tr. 150-151).

A cervical MRI on January 30, 2001, revealed minimal degenerative change without evidence of nerve root entrapment or compression and a solid fusion at C5-6 (Tr. 174-175; 149). On March 7, 2001, the plaintiff reported to Dr. Epstein that he had had some improvement of his cervical symptoms with the previously prescribed medication. Dr. Epstein diagnosed carpal tunnel syndrome and aggravation of existing cervical and lumbar degenerative disease, which was improving (Tr. 149).

On April 17, 2001, the plaintiff underwent right carpal tunnel release surgery (Tr. 97).

A physical examination by Dr. Jackson on July 27, 2001, yielded mostly normal results, except for slightly elevated blood glucose levels and cholesterol level. Dr. Jackson prescribed Celebrex for the plaintiff's chronic back pain (Tr. 116-117).

On August 31, 2001, Dr. Jackson noted that the plaintiff reported falling off a ladder and aggravating his back pain. Dr. Jackson prescribed pain medication which the plaintiff "uses infrequently." He also prescribed hypertension medication (Tr. 114).

At the hearing, the plaintiff testified that he was injured on the job in March 1993 and was let go about a year later based on diminished capacity because there were no jobs at SRS which he could do (Tr. 211). He testified that 90% of his pain was in his back and left side (Tr. 214). The plaintiff described his headaches as tolerable, controlled and fairly mild (Tr. 214-215). The medication for his headaches sometimes made him drowsy (Tr. 215). He also testified that he had no ongoing problems with his neck (Tr. 215). He testified that he had occasional numbness in his right hand and his left hand went to sleep regularly (Tr. 216). He helped his wife with her paper route by driving, but said that after working the paper route he had back pain and trouble sleeping at night (Tr. 217). He testified that he had "bad" days three or four times a month, in which he could hardly walk and was unable to go with his wife on the paper route (Tr. 218).

The plaintiff testified that his daily activities consisted of fixing breakfast, "piddling" in the yard, visiting and talking with friends at the barbershop, church activities and working with youth (Tr. 220-224). He also testified that he had not climbed a ladder since he retired, disputing Dr. Jackson's treatment note which indicated that he had aggravated his back after falling off a ladder in August 2001 (Tr. 230).

The ALJ took testimony from a vocational expert, who testified that based on the hypothetical presented, an individual with the capacity to perform light work with certain

9

functional limitations had the ability to perform several jobs which exist in the local and national economy (Tr. 234-236).

## **ANALYSIS**

The plaintiff alleges that the ALJ erred by (1) not properly assessing the plaintiff's pain and credibility; (2) not giving proper weight to the opinion of the plaintiff's physician; and (3) not finding that the plaintiff's headaches, carpal tunnel syndrome, cervical problems and high blood pressure were severe impairments.

### *Plaintiff's Credibility*

The plaintiff argues that the ALJ failed to properly assess the plaintiff's allegations of pain and his credibility. A claimant's allegations of pain, disability and limited function itself, or its severity, need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor by factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

The ALJ here clearly considered the plaintiff's subjective complaints in reaching his decision. He noted that the plaintiff's back problems prior to the date last insured were stable and were helped with medication. The ALJ referred to the plaintiff's testimony regarding his headaches, indicating that they were fairly mild. He also noted that the plaintiff engaged in significant daily activities, including visiting and chatting at the

10

barbershop, helping with the youth at church, and driving the car for his wife on her paper route. The ALJ noted that the plaintiff's treating physician prior to his DLI consistently indicated that the plaintiff was capable of performing light work, and further noted that the plaintiff was receiving treatment for pain, including medication, injections and physical therapy. The ALJ's credibility determination is supported by substantial evidence.

### *Treating Physician Opinion*

The plaintiff also contends that the ALJ erred in ignoring the opinion of Dr. Allen L. Sloan, the plaintiff's pain specialist. In a clinical assessment of pain questionnaire, Dr. Sloan stated that the plaintiff's pain is present to such an extent as to be distracting to the adequate performance of daily activities or work, and that greatly increased pain can be expected from the plaintiff's attempts to perform regular physical activities such as walking, standing, sitting, bending, stooping and moving of extremities (Tr. 194). The ALJ did not discuss Dr. Sloan's opinion.

Dr. Sloan's opinion did not address the plaintiff's condition or his pain prior to the DLI. In fact, Dr. Sloan did not begin to treat the plaintiff until January 16, 2002, four months after the expiration of the plaintiff's insured status (Tr. 145-146). The form filled out by Dr. Sloan clearly did not address the plaintiff's pain retrospectively, but merely related to the plaintiff's present condition. Because Dr. Sloan's assessment was not relevant to the plaintiff's condition and functioning in September 2001, the ALJ did not err in not considering Dr. Sloan's opinion.

### *Severity of Impairments*

The plaintiff further argues that the ALJ erred in finding that the plaintiff's cervical neck fusion, chronic migraine headaches, high blood pressure and carpal tunnel syndrome were non-severe impairments. In order to be considered "severe," an impairment

must significantly limit the claimant's ability to do basic work activities. *See Bowen v. Yuckert*, 482 U.S. 137, 140-142 (1987)(an impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do the work). "An impairment is 'not severe' or insignificant only if it is a slight abnormality which has a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Reichenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985). The burden is on the claimant to establish that he has a severe impairment.

The ALJ found the plaintiff's back impairment to be a severe impairment. However, he found that the plaintiff's other impairments were non-severe. This finding is supported by substantial evidence in the record.

The evidence in the record indicates that the plaintiff's headaches were controlled by medication. The plaintiff reported to his doctors on numerous occasions that Elavil helped his headaches and Fiorcet was effective for breakthrough headaches (Tr. 153-154; 157; 159-160; 163). The plaintiff also testified that his headaches were fairly mild and well-controlled on the medication (Tr. 214-215). Similarly, evidence in the record shows that the plaintiff's carpal tunnel syndrome is also under control. In March 2001, Dr. Epstein diagnosed carpal tunnel syndrome, right greater than left (Tr. 149). In April 2001, the plaintiff underwent right carpal tunnel release, after which Dr. Epstein reported that the condition was "asymptomatic" and "more or less under good control" (Tr. 97; 147-148). If a symptom or symptoms can be reasonably controlled by treatment or medication, it is not disabling. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

The plaintiff also contends that the ALJ erred by not finding his cervical fusion and degenerative disease to be a severe impairment. While the plaintiff did undergo cervical fusion surgery in 1982, he testified at the hearing that his neck was not causing him significant problems (Tr. 215). Moreover, Dr. Epstein's treatment notes indicate that his

cervical problems are under control and that he was "not symptomatic" (Tr. 147-148). There is no indication from any of the plaintiff's doctors that the plaintiff's neck problems resulted in any functional limitations.

There is also no evidence in the record that the plaintiff's high blood pressure caused any significant limitations. This condition was being treated with medication. The treating physician, Dr. Jackson, did not indicate that the plaintiff had any limitations as a result of his hypertension (Tr. 122).

There is substantial evidence in the record to support the ALJ's findings on this issue. Therefore, this claim is without merit.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed.

> s/William M. Catoe
> United States Magistrate Judge

May 31, 2005

Greenville, South Carolina

13